IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PARAMOUNT MEDIA GROUP, INC., an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 13 C 3994 |
| v. | ) ) | Judge Jorge Alonso |
| VILLAGE OF BELLWOOD, an Illinois municipal corporation, and IMAGE MEDIA, an Illinois corporation, | ) ) ) ) | Magistrate Judge Jeffrey Cole |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

The defendant Image Media has moved to bar the testimony of three expert witnesses of the plaintiff Paramount Media Group pursuant to Fed.R.Civ.P. 26(a)(2)(B) and 37(c)(1).

**I.**

Federal Rule of Civil Procedure 26(a)(2)(A) requires a party to "disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Along with the disclosure of the identity of its experts, a party must also submit a written report, "prepared and signed" by the expert, which contains the following information:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed.R.Civ.P. 26(a)(2)(B).

Failure to comply with the disclosure requirements of Rule 26(a) results in automatic and mandatory exclusion of the proffered witness "unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1). *See generally, Novak v. Board of Trustees of Southern Illinois University*, 777 F.3d 966, 972 (7th Cir. 2015). Courts look to several factors when deciding if non-compliance with Rule 26(a) is harmless, including prejudice or surprise, the ability to cure the prejudice, the likelihood of disruption at trial, and bad faith or willfulness. *See Tribble v. Evangelides,* 670 F.3d 753, 760 (7th Cir.2012). District courts have broad discretion in evaluating whether a Rule 26(a) violation is substantially justified or harmless. *See Alexander v. Mount Sinai Hosp. Med. Ctr.,* 484 F.3d 889, 901–02 (7th Cir.2007); *David v. Caterpillar, Inc.,* 324 F.3d 851, 857 (7th Cir.2003).

**David Quas**:

Mr. Quas, Paramount's CEO, offers an opinion as to the net present value of the income a billboard of the type at issue here – a 20' x 60' vinyl sign – should produce. He puts that figure at $3,611,673. He also provides an opinion as to the present value of the income a digital display billboard of the same size: $13,993,808. He says that he used a spreadsheet to arrive at his opinion, which he attaches to his report.

Image Media argues that Mr. Quas failed to disclose that he is not the true author of his report. That's certainly one way to put it because, as we shall see, Mr. Quas doesn't know much

2

about the number crunching that underlies "his" opinion. The real problem here is that Mr. Quas contributed so little to the formulation of "his" opinion that he is, to use Judge Posner's phrase, no more than a "mouthpiece" for the person who did the calculations, came up with the spreadsheet and, ultimately, the opinion regarding the present value of the future income of the two types of signs. That is not permitted. *See Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613-14 (7th Cir. 2002); *TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 734 (10th Cir.1993). *See also* the discussion in *Loeffel Steel v. Delta Brands,* 387 F.Supp.2d 794, 808 *et seq.* (N.D.Ill.2005).

At his deposition, Mr. Quas explained that all the work was done by David Wiegman. (Quas Dep., at 94). Mr. Quas has never calculated present value of future income of a billboard, and he relied entirely on Mr. Wiegman to select and input the discount rate, input the data, and create the spreadsheet. (Quas Dep., at 100). Mr. Quas cannot explain where the figures in the spreadsheet came from – other than from Mr. Wiegman, of course:

> Q: Okay, what's the number . . . 245,000 in the parenthesis?
>
> A: I don't know.
>
>         \*        \*        \*
>
> Q: The 750,000 number that's in parenthesis down by cash flow down at the bottom of the page –
>
> A: Yes.
>
> Q: – is that for the construction cost of the digital display?
>
> A: I believe so. It's not indicated –
>
> Q: The whole sign structure?
>
> A: Yes.

> Q: Do you know what that's for or are you guessing?
>
> A: I'm guessing.
>
> Q: So you don't know why that's there?
>
> * * *
>
> A: I don't know. I don't know.
>
> Q: So you don't know, then, what the 750,000 in parenthesis is at the bottom of the page is?
>
> A: I do not.

(Quas Dep., at 74, 91). That's a little odd, as Mr. Quas says unqualifiedly in his report that his calculation "took in consideration the expenses for the lease, electric, vinyl, install, vinyl production and *construction*." (Quas Report, at 2-3). Mr. Quas is similarly unfamiliar with the number for electrical cost. (Quas Dep., at 81, 83). He admits that his report doesn't indicate where many of the numbers that go into the calculations come from. (Quas Dep., at 81, 83, 85). When one looks at Mr. Quas's report and his deposition transcript in tandem, it looks like he was little more than a conduit, collecting numbers from various sources and handing them off to Mr. Wiegman to perform the work.

The upshot of all this is that Mr. Quas is just a spokesman for someone else. The expert appears to be Mr. Wiegman and Mr. Quas – although he is experienced in sales and management in the billboard industry – cannot explain how Mr. Wiegman got from point A to point B. All he can do is recite Mr. Wiegman's bottom line. That doesn't pass muster under the Fed.R.Evid. 702 or 703. "Rule 702 . . . require[s] . . . that the expert explain the "methodologies and principles" that support his opinion; he cannot simply assert a "bottom line." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010); *see also Bourke v. Conger*, 639 F.3d 344, 347 (7th Cir. 2011)("In order for "an expert report to create a genuine issue of fact, it must provide not merely ... conclusions, but

4

the basis for the conclusions.'); *Wendler & Ezra, P.C. v. American Intern. Group, Inc.*, 521 F.3d 790, 791 -792 (7th Cir.2008)("We have said over and over that an expert's *ipse dixit* is inadmissible. 'An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.' The district court was right to exclude the affidavit ....'").

And while Rule 703 of the Federal Rules of Evidence allows an expert to base an opinion on facts or data not admissible in evidence if of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. Mr. Quas isn't basing an opinion on Mr. Wiegman's work, he's adopting Mr. Wiegman's work and merely parroting his opinion.

In *Dura Automotive*, Judge Posner explained the concept this way:

> Suppose a thoracic surgeon gave expert evidence in a medical malpractice case that the plaintiff's decedent had died because the defendant, a radiologist, had negligently failed to diagnose the decedent's lung cancer until it was too advanced for surgery. The surgeon would be competent to testify that the cancer was too advanced for surgery, but in offering the additional and critical judgment that the radiologist should have discovered the cancer sooner he would be, at best, just parroting the opinion of an expert in radiology competent to testify that the defendant had x-rayed the decedent carelessly.

285 F.3d at 613. Here, Mr. Quas had less to do with the opinion than Judge Posner's surgeon did. Consequently, he must be barred from testifying as to the present value of the future income of the billboards.

**Rodolfo Aguilar**:

First, Mr. Aguilar does not bother to list any of the cases in which he's testified as an expert in the last 4 years, either at trial or deposition even though this information is required under Fed.R.Civ.P. 26(a)(2)(B)(v). Instead, under the heading "Expert Witness Testimony," he simply lists the names and chambers of over 100 judges. There's absolutely no indication of time frame – of

whether he testified as an expert in cases before every one of these judges in the past 4 years. (Aguilar Rep., at 94-105). Such information is all but useless, especially without any case names. The report is incomplete and subject to being stricken. *Finwall v. City of Chicago,* 239 F.R.D. 494, 508 (N.D.Ill.2006). [1]

The whole idea of the requirement is to allow the opponent to look into Mr. Aquilar's prior opinions and use them as a gauge against what he's done in this case. *See, e.g.*, *Albers by Albers v. Church of the Nazarene*, 698 F.2d 852, 858 (7th Cir. 1983)(expert's pattern of testimony in prior cases seriously undermined the credibility of his opinion). His views here might be inconsistent with his views in previous cases; he may prove to be nothing more than a hired gun who will says anything depending on who's paying the bill. *See Tyus v. Urban Search Management*, 102 F.3d 256, 263 (7th Cir. 1996). That, after all, is a common complaint about experts.[2]

---

[1] Paramount says it's okay because it's not as if no disclosure were made. [Dkt. #156, at7]. But a useless disclosure is hardly better than none at all. Moreover, neither litigants, their lawyers, nor their experts are at liberty to alter the Federal Rules of Civil Procedure and decide what disclosures can be dispensed with. *Cf. Goka v. Bobbitt*, 862 F.2d 646, 650 (7th Cir. 1988); *Finwall,* 239 F.R.D. at 502.

[2] *See, e.g., Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 382 (7th Cir.1986); *Indianapolis Colts v. Metropolitan Baltimore Football Club Ltd. Partnership*, 34 F.3d 410, 414 (7th Cir. 1994)(Posner, J.)("Many experts are willing for a generous (and sometimes for a modest) fee to bend their science in the direction from which their fee is coming."). Judge Jack Weinstein, author of Weinstein's Federal Evidence , has observed that "[a]n expert can be found to testify to the truth to almost any factual theory, no matter how frivolous." Weinstein, Improving Expert Testimony, 20 U. Rich.L.Rev. 473, 482 (1986). And let us not leave out Judge Easterbrook: The testimony from the expert in this case "exemplifies everything that is bad about expert witnesses in litigation. It is full of vigorous assertion..., carefully tailored to support plaintiffs' position but devoid of analysis." *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997).

Evidence scholars have expressed the same concerns. *See* Huber, Galileo's Revenge, Junk Science in the Courtroom, 206-09 (1991)("A Ph.D. can be found to swear to almost any 'expert' proposition no matter how false or foolish."); Graham, *Expert Witness Testimony and the Federal Rules of Evidence: Insuring Assurance of Trustworthiness* (1986) Ill.L.Rev. 43, 45 ("Today practicing lawyers can locate quickly and easily an expert witness to advocate nearly anything the lawyers desire."); Huber, *Safety and the Second Best: The Hazards of Public Risk Management in the Courts*, 85 Colum.L.Rev. 277, 333 (1985).

Paramount is rather flippant about this requirement. It says,"[i]f this Court determines that Dr. Aguilar has not complied with Rule 26(a)(B)(v)[sic], then it should determine that non-compliance is justified as he provided all the information contained in his records." [Dkt. # 156, at 7]. First of all, there is no "if" about whether the rule was violated. It was. Second of all, the next step is not to determine whether the violation was "justified", it is to determine whether it was harmless. It wasn't, as has just been pointed out.

And, third of all, there is nothing to indicate that Mr. Aguilar does not have access to such information. Beyond this unsubstantiated statement in the brief, which is not evidence and does not count, *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888 (1990); *INS v. Phinpathya,* 464 U.S. 183, 188–89 n. 6 (1984); *United States v. Chapman,* 694 F.3d 908, 914 (7th Cir.2012); *United States v. Diaz,* 533 F.3d 574, 578 (7th Cir.2008); *Campania Mgmt. Co. v. Rooks, Pitts & Poust,* 290 F.3d 843, 853 (7th Cir. 2002), at his deposition, he explained that "it's probably in some papers but [he] do[esn't] keep track of that information." (Aguilar Dep., at 24). He said he could probably put it together but it would be difficult to do. (Aguilar Dep., at 24-25). So, it's not as if it could not have been done, as Paramount suggests. But the real violation here falls at the feet of Paramount's attorneys. As Mr. Aguilar revealed:

Q: Did Mr. Broida or Mr. Nichele ever ask you to compile such a list?

A: No.

(Aguilar Dep., at 25). So, through its counsel, Paramount never had any intention of complying with the rule – it just didn't care. That's willfulness, and it further warrants against a finding that the

violation of the rule was harmless. *Tribble,* 670 F.3d at 760.[3]

Image Media's second objection to Dr. Aguilar's report is that it does not list all his publications from the last 10 years as required by Fed.R.Civ.P. 26(a)(2)(B)(iv), only his publications regarding billboards. His other publications are in architecture and engineering. (Aguilar Dep., at 21). Ordinarily, this might be nothing more than a quibble. Arguably, the billboard publications are the relevant ones. But, here, it is more troubling because it is one more example in a pattern of Rule 26(a)(2)(B) violations on Paramount's part. And, it is not up to Paramount, its lawyers, or its expert to tell Image Media which publication should and should not be disclosed. The rule is not limited to disclosure of certain publications, Fed.R.Civ.P. 26(a)(2)(B)(iv), and the plaintiff's insouciance towards its obligations under Rule 26 cannot be condoned and dismissed as inconsequential.

Finally, Image Media contends that Mr. Aguilar's report failed to disclose all the bases for his opinion. It is perhaps more accurate to say that he did not disclose all the facts or data he considered in arriving at his conclusions; but either failing is grounds for excluding an expert opinion. Fed.R.Civ.P. 26(a)(2)(B)(i); (ii). Mr. Aguilar opined that the market value of Paramount's 50-year ground lease for the billboard site was just over $1.6 million. Along the way he performed analyses under three approaches: cost approach, income approach, and sales comparison approach.

The cost approach involved a determination of construction costs. (Aguilar Rep., at 63-69). At his deposition, Mr. Aguilar claimed that, in order to arrive at a figure, he relied on data that he has on billboard construction from a number of places, including the Midwest. (Aguilar Dep., at 94).

---

[3] Parties are bound by the acts and omissions of their lawyers even when they cause harm. *Sahyers v. Prugh, Holliday & Karatinos, P.L.*, 560 F.3d 1241, 1245 (11th Cir. 2009); *Farzana K. v. Indiana Dept. of Education*, 473 F.3d 703 (7th Cir. 2007); *United States v. Babul*, 476 F.3d 498 (7th Cir. 2007); *Cannon-Stokes v. Potter*, 453 F.3d 446 (7th Cir. 2006); *Coleman v. Smith*, 814 F.2d 1142, 1146 (7th Cir. 1987). *See also Link v. Wabash Railroad Co.*, 370 U.S. 626, 633-34 (1962).

He's accumulated it over the years. (Aguilar Dep., at 94). But those numbers are not a part of his report.

> Q: This is your estimate of the cost to build Paramount's sign, correct?
>
> A: Correct.
>
> Q: My question is: Where is the data on which you based your estimate of the cost to build Paramount's sign?
>
> A: These are the types of data I have in my data.
>
> Q: I understand that these are the types of data. Where is the actual data itself?
>
> A: I don't have any actual data. A bid from a contractor or something? . . . I don't have that.

(Aguilar Dep., at 95). Mr. Aguilar then claimed that he had data from Pennsylvania, Indiana, and Illinois, that told him his estimate for construction cost was good. (Aguilar Dep., at 95). But, again, the underlying data is not in his report.

> Q: Did you rely on any of the examples from Michigan or Wisconsin in estimating the cost to build the sign at issue in this case?
>
> A: I probably did. I don't remember which specific ones.
>
> Q: Do you have a record somewhere of which records you relied on?
>
> A: No.

(Aguilar Dep., at 97). So, Mr. Aguilar had to admit that he didn't disclose the facts or data underlying his opinion. According to him – and Paramount – he didn't have to because he's "an architect and also an engineer, so [he has] . . . some expertise in this." (Aguilar Dep., at 97); [Dkt. #156, at 8].

He may have some expertise, but that does not allow Paramount to ignore Fed.R.Civ.P.

26(a)(2)(B)(i) or (ii). It is true that an expert can, and quite often does, rely on experience and expertise in arriving at an opinion. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). But where the expert brings that experience or expertise to bear on hard numbers, those numbers have to be revealed. This allows the opponent to challenge what the expert did with those numbers. Suppose Mr. Aguilar were a radiologist interpreting an x-ray. He is able to accomplish that through his education, experience and expertise. But that doesn't mean he doesn't have to disclose the x-ray. *See Vollmert v. Wisconsin Dept. of Transp.*, 197 F.3d 293, 301 (7th Cir. 1999). An expert must disclose not merely all the data that he relied upon, but all the data he even considered. *Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*, 412 F.3d 745, 751 (7th Cir. 2005). Here, Mr. Aguilar clearly said he relied on data he had accumulated – he simply did not disclose it. This is yet another violation of the disclosure rules.

There are similar problems with Mr. Aguilar's income approach opinion. (Aguilar Rep., at 70-75). A necessary portion of this was a capitalization rate analysis. (Aguilar Rep., at 73-75). In his report, Mr. Aguilar says he "analyzed several sources" and concluded that "an investor in the subject property could reasonably expect to obtain a loan of 70% of the purchase price, with an interest rate of 6.00% and an amortization term of twenty-five (25) years . . . ." (Aguilar Rep., at 73). At his deposition, Mr. Aguilar said that he relied on "several data points" to reach his conclusion in this regard. (Aguilar Dep., at 137-38). He conceded that these data points were not identified in his report and explained that it was "stuff that [he] know[s]." (Aguilar Dep., at 137). It may have come from other appraisals he has done or, significantly in this case, other expert opinions he has given. (Aguilar Dep., at 138). But, again, without any disclosure of the data, Image Media is hamstrung as to challenging Mr. Aguilar's opinion. That problem is underscored here because, as already

10

discussed, Mr. Aguilar has not disclosed the other cases he's testified as an expert witness in.

**Gerald Page**:

Mr. Page's report raises the issue of the two site plans, one from February 2014 and the other from September 2014. The more recent plan was not disclosed in a timely manner and, on October 29, 2014, I ruled that Paramount's experts could not rely on it and Mr. Page's original report, which was based on the September 2014 plan, was stricken. [Dkt. # 124]. Paramount objected to that ruling on November 7, 2014 [Dkt. # 125], and those objections are pending before Judge Alonso. *See* Fed.R.Civ.P 72(a)("The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or contrary to law."). Any further ruling will necessarily inveigle Judge Alonso's resolution of those objections but, as six months have past, Image Media's concerns about Mr. Page's new report will be addressed and Judge Alonso will, of course, be free to make any adjustments he deems necessary when he rules on Paramount's objections to the order of October 29, 2014.

In addition to filing objections to the October 29, 2014 order, Paramount also sought leave to amend Mr. Page's expert report. The basis of this motion was Paramount's assertion that the "differences between the February 10, 2014 site plan and the September 9, 2014 site plan are insignificant as the only change is the placement of where the column is going to be located" and that Mr. Page switching from reliance on the later report to the earlier one "will only provide minor, if any, changes . . . ." [Dkt. # 127, at 2]. I granted Paramount's motion on December 10, 2014, "with the caveat that following expert discovery, the defendants are free, should they choose to, to file an appropriate motion should further discovery warrant such a motion." [Dkt. # 140]. Image Media has done just that, as result of Mr. Page's deposition.

True to Paramount's word, Mr. Page made only minor changes from his first report to his second. Supposedly, it took him over five hours to prepare the new report (Page Dep., at 42-43), but the only thing he did was change the date of the report he relied upon from September 9, 2014, to February 10, 2014. Other than that, [Dkt. # 156, at 10], as Paramount concedes, the reports are identical, and he arrived at the same conclusion: that "it does not appear that any parking spots will be significantly affected or blocked as a result of the construction of the billboard structure." [Dkt. # 156-5, at 1-2; Dkt. # 156-6, at 1-2].

Image Media cries foul because at his deposition thereafter, Mr. Page testified as follows:

Q. And it was your understanding that the purpose of your amended report was to review and give an opinion on the feasibility of the new sign design, right?

A. Yes.

Q. All right. So let's turn then to your first report, which is Exhibit 4. So if you look at the design drawings and the site plan that were attached to your first report–

A. Yes.

Q. --and you compare them to the site plans and the design drawings attached to your amended report–

A. Yes.

Q. --these are different signs, correct?

A. Let's see here. Oh yes.

Q. And they are different designs?

A. Different designs.

Q. And the columns are obviously in a different place, correct?

    A. Yes.

    Q. And therefore, the effect of the column on the parking spaces would also be different, right?

    A. Yes.

    Q. They would affect different spaces in different ways maybe is the way to put it?

    A. Different spaces in different ways.

(Page Dep., at 43, 81-82). The change in location of the billboard, in Mr. Page's eyes, then, resulted in a different impact on parking spaces. Yet, his second report gives no indication of that. The impact cited in his second report is identical that cited in his first report.

But Image Media found out a bit more in discovery. When asked about the change in location and its significance, Mr. Quas explained:

> The original site plan was changed because as part of image Media's arguments, there was a claim that the column of pipe of the display would take up a parking space on the property. And so I contacted GRC Engineering and asked them to relocate the column pipe to the east of the property in an area I felt was less intrusive to the grounds.

(Quas Dep, at 17). The only reason for the change in the site plan from February to September was the parking space issue. (Quas Dep., at 17).

So, we have two Paramount experts saying in their depositions that the change made a difference regarding parking spaces, and yet we have one of those two experts saying in his second report that the change made no difference. Image Media argues that this means that Paramount is simply smuggling their original report in under the guise of a new one. But, by all accounts, it is a new report. It's just that, despite the deposition testimony of two of its experts, Paramount claims there is no difference in the affect on parking spaces with the billboard in a different location. As

13

such, the remedy is not striking the report and barring Mr. Page from testifying. Given his testimony and that of Mr. Quas, and the fact that Mr. Page's second report simply duplicated, verbatim, his first report, Mr. Page is likely going to have little or no credibility when he testifies as to his conclusion in his second report. The remedy for Image Media is cross-examination, "the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 766 (7th Cir. 2013).

## CONCLUSION

The defendant's motion to bar the opinions of plaintiff's experts [Dkt. # 149] is GRANTED in part and DENIED in part.

**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 5/28/15

**Under Fed.R.Civ.P. 72(a), parties must file any objections to this order within 14 days. The district judge must consider timely objections and modify or set aside any art of this order that is clearly erroneous or contrary to law. Failure to file timely objections constitutes a waiver of any objections to this order.** *Williamson v. Indiana University*, **345 F.3d 459, 464 (7th Cir. 2003).**

14